**Danielle M. Chaffin, 0093730**
**Daniel J. Leffler, 0076540**
OHIO PATROLMEN'S BENEVOLENT ASSOCIATION
10147 Royalton Road, Suite J
North Royalton, Ohio 44133
Telephone: (440) 237-7900
Facsimile: (440) 237-6446
dchaffin@opba.com
dleffler@opba.com

Attorneys for Plaintiff.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **JASON SAMS**, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL REQUESTED.** |
| **CITY OF NORTON**, an Ohio municipality; **ROBERT FOWLER**, in his personal and official capacity as (former) Administrator of the City of Norton; **MICHAEL "MIKE" ZITA**, in his personal and official capacity as Mayor of the City of Norton; **JUSTIN P. MARKEY**, in his personal and official capacity as Solicitor of the City of Norton; and **JOHN DOES 1-5.** | |
| Defendants. | |

### INTRODUCTORY STATEMENT

Plaintiff Jason Sams ("Plaintiff" or "Officer Sams") has served the community of Norton, Ohio as a part-time Police Officer for over twenty (20) years. He has worked hard to gain the respect of the citizens and his superiors. Plaintiff has received countless commendations, letters of recognition and awards over his decades of services. In August 2021, Plaintiff was surreptitiously recorded while having an off-duty conversation with an acquaintance. During this conversation, Plaintiff made a comment about a news article in *The Barberton Herald* concerning the Norton

Chief of Police, John Dalessandro. When Defendants became aware of that conversation, Officer Sams was placed on unpaid administrative leave. Officer Sams remained on unpaid administrative leave for months, fearing he would be wrongfully prosecuted because of actions and inaction on the part of Defendants. Officer Sams was eventually issued a fourteen (14) day suspension, as a direct result of his statements, which were constitutionally protected. Defendants' actions were in bad faith and have resulted in the tarnishing of Officer Sams' reputation.

## JURISDICTION AND VENUE

1.  This action arises under the United States Constitution, particularly the First and Fourteenth Amendments; under federal law, particularly 42 U.S.C. §1983 and 28 U.S.C. §§ 1331, 1343 and 1367; and State of Ohio common law.

2.  Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b), in that the events giving rise to the claim occurred within the District.

3.  This Court is authorized to award attorneys' fees pursuant to 42 U.S.C. §1988.

## PARTIES

4.  At all material times, Plaintiff was and is a citizen of the United States and a resident of Ohio, over the age of eighteen (18) years. Plaintiff is a long-time resident of Norton, Ohio. At all material times, Plaintiff served as a part-time Police Officer, during which time he received numerous awards and commendations, including an Award of Valor for his role in preventing a mass shooting event.

5.  At all material times, Defendant Robert Fowler ("Fowler") was a city official [the former Administrative Officer for the City of Norton, Ohio] who is being sued in his official and personal capacities. In addition to serving as the Administrative Officer, Fowler served as Director of Public Safety, Director of Public Service and Director of Personnel in accordance with Sections

4 and 5 of the City of Norton Charter. In serving in these roles, Fowler was granted final policy making authority relative to the Police Division, including the removal and discipline of the officers and employees of that Division. Upon information and belief, John Does 1-5 are individuals who have acted in concert with Defendant Fowler, both in official and personal capacities, to take the actions alleged below.

6. At all material times, Defendant Michael Zita ("Zita" or "Mayor Zita") was a city official [Mayor of the City of Norton, with policy making authority], who is being sued in his official and personal capacities. Defendant Zita was at all material times responsible for hiring, overseeing and monitoring Defendant Fowler and other City employees. Upon information and belief, John Does 1-5 are individuals who have acted in concert with Defendant Zita, both in official and personal capacities, to take the actions alleged below.

7. At all material times, Defendant Justin P. Markey ("Markey") was a city official [Solicitor of the City of Norton], who is being sued in his official and personal capacities. Defendant Markey was at all material times the legal advisor of, and attorney for, the Defendants, and participated in the decisions which led to the unlawful employment actions alleged below. Upon information and belief, John Does 1-5 are individuals who have acted in concert with Defendant Markey, both in official and personal capacities, to take the actions alleged below.

8. Defendant City of Norton is an Ohio charter-based municipality, which has been under the control of, or operated through, Defendant Fowler, Defendant Zita, Defendant Markey and John Does 1-5.

9. All of the acts of Defendants and their officers, agents, employees, and servants were executed by Defendants under the color and pretense of the policies and ordinances of the City of Norton and the laws of the State of Ohio.

## STATEMENT OF FACTS

10. Officer Sams has served as a part-time Police Officer with the City of Norton Police Department since 2000. His personnel file is filled with commendations from the public, cooperating agencies and his supervisors.

11. In May 2021, members of the Norton Police Department sent Defendant Fowler a letter entitled "VOTE OF NO CONFIDENCE". This letter stated, in part:

> We have lost all trust, faith and confidence in Chief John Dalessandro's ability to lead this Department. This decision does not come easily and the greater good of the agency and city must be kept in mind. Chief Dalessandro has fostered an atmosphere of hostility, retaliation, and unethical behavior. He has established a pattern and practice of inequitable treatment of Department personnel. His lack of leadership, management, and poor policy decisions have damaged the relationship between the city administration and the men and women of the Norton Police Department.

12. The No Confidence Letter also stated, "Recent overly harsh discipline, undermining seniority and continually violating the agreed upon contract are only a few of the ongoing problems within the Department… In closing, we would like to reiterate that the men and women of the Norton Police Department have lost all trust and faith in Chief Dalessandro and his ability to lead this Department."

13. Prior to releasing the "No Confidence Letter", members of the Norton Police Department took a vote on whether the letter should be written and released. The vote was 22-0 in favor of publishing the letter; one member abstained from the vote.

14. Quotes from the "No Confidence Letter" were published on the front page of the *Barberton Herald* newspaper on Thursday, May 27, 2021. The news article specifically quoted the section of the letter which alleged that Chief Dalessandro had engaged in "unethical behavior" and that there had been a 22-0 vote against the Chief.

15. Following the publication of the No Confidence Letter, the City of Norton hired a management side law firm to conduct a "SWOT Analysis". This "analysis" outlined the strengths and weaknesses of the Norton Police Department. This analysis was not an investigation into the allegations against Chief Dalessandro, and made no determination about whether the allegations were true or not.

16. In June or July 2021, Officer Sams received a call from a friend named Shaun Rocky Jaber. Mr. Jaber is a Barberton, Ohio, City Councilman and owns a gas station in Barberton that Officer Sams has frequented for years. During that call, Mr. Jaber mentioned that he was being followed by a private investigator, David Oliver.

17. David Oliver is a former Police Chief who resigned amid allegations of theft in office. David Oliver later began working as a private investigator. He was hired by members of the Barberton City Council to investigate whether Mr. Jaber actually lived in the City of Barberton or not.

18. Prior to being arrested and convicted, David Oliver wrote a book, which was sold at Acme supermarkets. Officer Sams works full-time as the Director of Security for all Acme grocery stores. Mr. Jaber knew that Oliver and Sams were acquaintances, which is why Mr. Jaber asked Mr. Sams, "Do you mind talking to [Oliver] and maybe helping out trying to understand what's going on?" Officer Sams did not see any harm in being the "go-between" and trying to see if there was anything that he "could help the two of them with."

19. Officer Sams met with David Oliver in a parking lot on July 2, 2021. Officer Sams was not in uniform and was not acting on behalf of the Norton Police Department. Unbeknownst to Officer Sams, David Oliver was secretly recording their meeting using a camera and microphone hidden in a coffee cup.

20. During the meeting Officer Sams is friendly with Oliver and offers to help him with his investigation. Officer Sams discusses business dealings by politicians in the area which he does not believe are on the up-and-up, including a land deal by the City of Barberton Mayor. Officer Sams also asks Oliver if he saw the article in the *Barberton Herald* newspaper about the no confidence vote the Norton police officers conducted regarding the Norton Chief of Police. Officer Sams then mentions how their Chief is cousins with the Norton Mayor (Defendant Zita) and makes a reference back to his earlier comment about not liking "unethical things". *Id.*

21. Plaintiff's conversation with Oliver was constitutionally protected under the First and Fourteenth Amendments.

22. Oliver provided the recording of his conversation with Officer Sams to the Summit County Sheriff's Office. The Summit County Sheriff's Office was already conducting an investigation into a full-time Norton police officer's use of LEADS, also as a result of information provided by David Oliver.

23. Mid-August 2021, the Summit County Sheriff's Office attempted to interview Officer Sams and the full-time police officer. Both officers declined to give a statement without an attorney present. In direct retaliation for exercising their Fifth Amendment rights, Defendants put both officers on administrative leave on August 11, 2021. The full-time officer was placed on paid administrative leave, while Plaintiff Jason Sams' letter stated that he was being placed on unpaid administrative leave.

24. Chief Dalessandro then sent an e-mail to the entire Police Department stating that the allegations against Plaintiff were "serious." This was a complete fabrication and was meant to tarnish Plaintiff's reputation.

25. Around August 29, 2021, the Summit County Sheriff's Office informed Defendant Fowler and Defendant Markey that Sams was cleared of any wrongdoing and their investigation into the recording was closed. Defendants never told Officer Sams that he had been cleared of wrongdoing by the Summit County Sheriff's Office. Officer Sams remained on unpaid administrative leave. Defendants consciously chose to conceal the fact that the criminal investigation had been closed from Plaintiff and the entire Police Department.

26. Defendant Fowler, acting in concert with other Defendants, employed the management side law firm Stefanik, Iosue & Associates, LLC to conduct an internal investigation into whether Officer Sams violated any City of Norton or Norton Police Department policies when he met with Oliver and made statements about Chief Dalessandro and the vote of no confidence.

27. Although not instructed to do so, Chief Dalessandro issued a memorandum to Justin Hartzel ("Hartzell"), an attorney employed by Stefanik, Iosue & Associates, LLC, in which he informed Hartzell that Officer Sams violated numerous policies in meeting with Oliver, associating himself with Jaber, and in making derogatory statements about his competency as Chief.

28. On or about January 4, 2022, Hartzell submitted a memorandum to Defendant Fowler and Defendant Markey regarding his "Investigation of Patrolmen Sams and Karnuth".

29. Within that memo, Hartzel opined that that Officer Sams violated multiple policies. Hartzel's report states:

> Policy 320.5.8 prohibits, amongst other things, "[d]isparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of [the] department or subverts good order, efficiency and discipline of [the] department or that would tend to discredit any of its members." See Policy 320.5.8(e). Sams's [sic] remarks about the "no confidence" vote in Dalessandro, and his statement – and its implication – that Dalessandro is the mayor's cousin, certainly tends to discredit Dalessandro. The obvious implication of Sams's [sic] statement is that nothing will happen to Dalessandro, or that Dalessandro is receiving some kind of preferential treatment, because he is related to the mayor, or even that Dalessandro is in his position because of his relationship with the mayor. In addition, Sams's [sic] comments about not liking

"unethical things," in relation to speaking about Dalessandro and the mayor, also tends to discredit Dalessandro by implying that Dalessandro has engaged in unethical activities.

30. Hartzel then included the following footnote, warning that disciplining Officer Sams for his speech could violate the First Amendment:

Although the undersigned concluded that Sams violated Policy 320.5.8(e) by making disparaging remarks about Dalessandro, consideration should be given to any potential First Amendment issues prior to issuing any discipline. Generally speaking, public employee speech only receives First Amendment protection when the public employee is speaking as a citizen and addressing matters of public concern. See *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006), citing *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968). However, that protection is not absolute – courts balance the public employee's First Amendment rights with the public employer's need to promote efficiency of the public services it performs through its employees.

31. Hartzel also concludes the following in his report:

Policy 1027.4 lists several areas of prohibited speech unless the speech is otherwise protected. See *Policy 1027.4.* One such category of prohibited speech is "[s]peech or expression that, while not made pursuant to an official duty, is significantly linked to, or related to, the Norton Police Department and tends to compromise or damage the mission, function, reputation or professionalism of the Norton Police Department or its employees." See *Policy 1027.4(b).* Sams's remarks to Oliver about the "no confidence" vote in Dalessandro, the fact that Dalessandro is the mayor's cousin, and his comments about "politics" and not liking "unethical behavior" in relation to Dalessandro and the mayor, in the undersigned's opinion, were obviously related to the Norton Police Department and, further, tended to compromise or damage the mission, function, reputation, or professionalism of the Norton Police Department and its employees (namely, Dalessandro).

32. Hartzel again cautions in a separate footnote regarding Policy 1027.4 that "Consideration should also be given here to any potential First Amendment issues."

33. On February 2, 2022, Defendant Fowler, acting in concert with other Defendants, issued a letter to Officer Sams finding that he violated numerous policies, including Policies 320.5.8(e) and 1027.4(b), referenced above.

34. Defendant Fowler, acting in concert with other Defendants, issued Plaintiff a fourteen (14) day unpaid suspension, effective February 5, 2022, with an additional thirty (30)

days of unpaid suspension held in abeyance for two (2) years from his return-to-work date pending no other disciplinary action.

35. Defendant Fowler, acting in concert with other Defendants, further required Plaintiff to undergo a fitness for duty examination, which included a psychological examination, before allowing him to return to work.

36. Defendants did not permit Plaintiff to return to work until approximately February 25, 2022. Plaintiff's first shift back was March 3, 2022.

37. Plaintiff Officer Sams was on a combination of unpaid administrative leave, and an unpaid suspension from October 3, 2021 through February 25, 2022 as a result of comments made to David Oliver on July 2, 2021. Officer Sams suffered an adverse employment action which resulted in economic harm, including loss of income, loss of other tertiary benefits of employment and loss of months of service towards his retirement. Further, Officer Sams was barred from entering the Norton Police Department where he had worked for twenty (20) years and was shunned by his co-workers and superiors.

38. The unpaid administrative leave and suspension were in retaliation for Officer Sams' decision to exercise his First and Fifth Amendment rights. Officer Sams' speech was a substantial or motivating factor in deciding to place him on unpaid administrative leave and issue an unpaid suspension. While under oath at an arbitration, Defendant Fowler made several statements which demonstrate this fact:

   a. When asked by his attorney, "Isn't this amount of discipline harsh for comments that Officer Sams made in what he thought was a private conversation when he thought he was off duty", Defendant Fowler responded, "I can understand how someone could think in that manner, but we felt it was serious enough to warrant significant discipline."

  b. Defendant Fowler further stated, "I used [Hartzell's] report, which outlined the policy violations, in order to justify my discipline." Hartzell opined that Officer Sams' speech violated multiple policies.

  39. Officer Sams was not on duty when he met with Oliver and made the comments which ultimately led to his unpaid suspension and unpaid administrative leave. Further, Officer Sams was not in uniform, and the statements were not a part of, or intertwined with, Plaintiff's job responsibilities. Officer Sams was not responsible for investigating the allegations into Chief Dalessandro and he was not authorized to make any official comments on behalf of the Norton Police Department. He speech was not in furtherance of assigned work duties. Officer Sams was acting and speaking as a private citizen at the time that he met with, and spoke to, David Oliver.

  40. Plaintiff Sams' speech addressed matters of public concern – mainly the efficiency and competency of the top law enforcement officer in the City of Norton, as well as allusions to public corruption.

  41. During his meeting with Oliver, Plaintiff Sams discussed what he believed to be unethical behavior by public officials in both Norton and Barberton. Plaintiff Sams mentioned the no-confidence vote, which is clearly of legitimate news interest and of value and concern to the public, as the letter made the front page of the local newspaper.  The vote was also discussed at multiple City Council meetings.

  42. Plaintiff Sams discussed the community-relevant issues of law enforcement and public safety, when he discussed Chief Dalessandro's ability to lead his department and his alleged unethical behavior.

  43. Plaintiff Sams spoke about the appearance of public corruption and nepotism when he mentioned that Chief Dalessandro is Defendant Mayor Zita's cousin.  Defendant Zita is above Chief Dalessandro in the chain of command.

44. Officer Sams' speech had little to no effect on the actual operations of the Norton Police Department. Police services were not disrupted as a result of the speech, and no citizens complained about the statements or said that Officer Sams' statements brought discredit to the Norton Police Department.

45. Officer Sams' speech did not affect the institutional efficiency of the Police Department.

46. Officer Sams is not in a confidential or policy making role within the Norton Police Department.

47. At the time the statements were made, Oliver was conducting a private investigation – not a police investigation – so Officer Sams was not interfering with any sort of official police business.

48. The City of Norton spent tens of thousands of dollars in resources and manpower investigating Plaintiff and defending his resulting discipline. This was an utter waste of time and resources as Plaintiff's activity was clearly constitutionally protected.

49. Defendants had no compelling governmental interest in investigating and disciplining Plaintiff because he exercised his constitutional rights.

50. While on unpaid leave, Officer Sams missed out on a minimum of 112 hours of pay per month in October, November and December of 2021, as well as in January 2022. Officer Sams was denied the opportunity to work at least sixty-four (64) hours in February 2022. Officer Sams wrongfully denied the opportunity to work his usual hours during the months of March and April 2022. Officer Sams would have been paid $24.10 per hour for all hours worked in 2021 and $25.10 per hour for all hours worked in 2022.

51. Officer Sams was wrongfully denied ancillary employment benefits, such as sick-time accrual and pension contributions due, to being put on unpaid administrative leave.

52. Officer Sams suffered immeasurable and irreparable harm to his reputation as a result of this ordeal. On February 13, 2022, the Akron Beacon Journal ran an article on the front page of their Sunday print edition, entitled "A hidden camera, a private eye and 2 suspended police officers: What happened in Norton?" This article stated that Officer Sams received a two-week suspension for the comments he made about the Chief. It also referenced the requirement that he undergo a fitness for duty exam, with the obvious implication being that his employer did not believe he was mentally fit to be a police officer. The article went even further in damaging Sams' reputation by quoting the section from Hartzell's report alleging that Officer Sams might have been trying to bribe Oliver. This allegation was completely false and was denied by Sams and Oliver; but facts do not usually matter in the court of public opinion. In addition to being sent directly to thousands of homes as part of the Sunday paper, and being sold at gas stations and other retailers throughout the entire greater-Akron area, the story was published online for potentially millions of individuals to view.

53. Plaintiff's suspension directly affected his employability. Plaintiff has served as the Director of Security for Acme Supermarkets since 1997. The allegations that he committed policy violations severe enough to warrant a penalty just short of termination almost cost him his full-time position with Acme. He also now has a reputation within the community as a dishonest troublemaker who does not respect the chain of command, thereby affecting his ability to find other employment, should he ever want to leave Acme or the Norton Police Department.

54. Plaintiff suffered significant emotional distress as a result of City officials' intentional actions and inactions. Sams has worked as a part-time police officer for over twenty (20) years, not for the money, but because it allows him to genuinely help his community. Coming from a law enforcement family, he takes great pride and honor in putting on his uniform and badge. He feels an obligation to put his life on the line to protect others. But because a few individuals felt personally

offended by a statement he made, all of that was stripped from Sams. He was kept from a job that brings him happiness.

55.     Plaintiff Sams was made to believe that he was going to be criminally prosecuted. In fact, at some point Defendant Fowler began intentionally spreading false information, which made its way back to Plaintiff Sams. On October 21, 2021, Defendant Fowler was recorded engaging in conversation with members of the Norton Police Department, when someone Defendant Fowler the status of the investigation into Plaintiff. Defendant Fowler responds by stating that a "special prosecutor" was involved. This was a complete fabrication. Defendant Fowler further states, "You can tell Jason Sams he will never work here again. I am, on – I am definitely certain of that."

56.     Plaintiff Sams feared that Norton officials would stop at nothing to damage his reputation and keep him from ever working as a police officer again.

57.     Plaintiff Sams was treated for post-traumatic stress disorder by a counselor as a result of the above-described events.  Officer Sams incurred medical bills from that treatment.

58.     Defendant Fowler has previously demonstrated this type of vindictive and retaliatory behavior. His prior employment was ended due to the way that he treated his employees, a fact which was known to Defendants at the time that he was hired.

## CAUSES OF ACTION

### First Claim
### (42 U.S.C. §1983: Denial of First Amendment Rights/Privileges)
### (Against Defendants Fowler, Zita and Markey)

59.     Plaintiff realleges the allegations of paragraphs 1 – 58 herein.

60.     The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the state by the Fourteenth Amendment to the United States Constitution, forbids government intrusion on the exercise of free speech.

61. While employed as a part-time police officer with the City of Norton, Plaintiff was a public employee.

62. It has been clearly established law for decades that public employees have the right to communicate about matters of public concern and that public officials may not retaliate against people, including public employees, for free speech.[1] All public officials have been charged with knowing that public employees may not be disciplined for engaging in protected speech on matters of public concern. Departmental policies regarding "[d]isparaging remarks or conduct" or speech which tends to cast a negative light on the Norton Police Department cannot serve as the basis for discipline, because department policies cannot supersede an employee's constitutional rights.

63. Defendants engaged in acts of retaliation, including but not limited to the following:

   a. Placing Plaintiff on unpaid administrative leave for months;

   b. Subjecting Plaintiff to an investigation into whether his conduct violated policy, and informing all of his coworkers that the allegations against him were "serious";

   c. Publicly stating that Plaintiff would "never work" in Norton again;

   d. Publicly stating that a special prosecutor had been appointed to look into Plaintiff's conduct, which was a false statement;

   e. Requiring Plaintiff to undergo a fitness for duty examination; and

   f. Suspending Plaintiff for fourteen (14) days with another thirty (30) days held in abeyance.

64. These acts of retaliation would chill a person of ordinary firmness from continuing to engage in constitutionally protected conduct. Plaintiff's conversation with Oliver was a substantial or motivating factor in Defendants' decisions to retaliate against Plaintiff in the ways outlined in paragraph 63.

---

[1] *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) "All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern …")

65. Defendants Fowler, Zita, Markey, and John Does 1-5, have acted under color and state of law to deprive Plaintiff of his federal civil and constitutional rights.

66. As a direct and proximate result of Defendants' retaliation, Officer Sams has suffered and will continue to suffer economic damages for which Defendants are liable, including, but not limited to: the loss of salary, wages, and benefits; other terms, privileges and conditions of employment; and loss of future employability.

67. As a direct result of Defendants' actions, Plaintiff suffered compensatory damages for emotional pain, suffering, inconvenience and mental anguish. Despite devoting himself to law enforcement, and to helping people for the last twenty (20) years of his life, Plaintiff has been wrongfully subjected to public humiliation and ridicule in his hometown and the surrounding area. In addition, Defendants have directly and indirectly contributed to the broadcast of false and misleading assertions against Plaintiff throughout the State through intentionally or recklessly skewed releases of information to others, including the media, resulting in humiliation, disparagement and ridicule.

68. As a direct result of Defendants' misconduct, Plaintiff has been avoided, stared at, and whispered about, causing general damage to his career, reputation, honor and dignity. Plaintiff has suffered stress, sleeplessness, weight loss, and irritability, as a result of Defendants' retaliation.

69. As a direct result of Defendants' retaliation in violation of Plaintiff's constitutional rights, Plaintiff has suffered adverse employment sanctions.

70. As a direct result of Defendants' actions, Plaintiff has been publicly attacked, suffered damage to his standing in his home community, and suffered the foreclosure of other employment opportunities by the wrongful stigma imposed upon him.

71. Plaintiff seeks economic and non-economic damages from Defendants in an amount to be determined at trial.

72. Defendants' actions were wanton, willful, egregious, and malicious, and are worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

73. Plaintiff requests an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988.

### Second Claim
### (42 U.S.C. §1983: Denial of First Amendment Rights/Privileges)
### (Against the City of Norton)

74. Plaintiff realleges the allegations of paragraphs 1 – 73 herein against Defendant City.

75. Defendants Fowler, Zita and Markey – as the City Administrator, Mayor and Solicitor respectively – are sufficiently empowered public officials that their acts constitute the customs, policies, and practices of the City of Norton. Based upon Officer Sams' speech, the individual Defendants instituted a campaign of retaliation.

76. The retaliation was part of a custom, policy, pattern, or practice to curtailing speech.

77. The Defendant City has failed to provide the relevant personnel with training on the First Amendment and its protections – including the prohibition on retaliating against public employees for protected speech.

78. As a direct and proximate result of Defendant City's retaliation, Officer Sams has suffered and will continue to suffer economic and non-economic damages, enumerated more fully above.

79. Defendant's actions were wanton, willful, egregious, and malicious, and are worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

80. Plaintiff requests an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988.

### Third Claim
### (42 U.S.C. §1983: Denial of Liberty and Property Interests)
### (Against All Defendants)

81. Plaintiff realleges the allegations of paragraphs 1-80 herein.

82. While employed as a part-time police officer with the City of Norton, Plaintiff had liberty and property interests, which were protected by the due process clause of the Fourteenth Amendment of the United States Constitution, to be free from false charges made under color of law which involved or implied personal and professional dishonesty, immorality or malfeasance in office, which adversely reflected on and damaged his standing and ability to continue his employment, and his career and future in his profession and community.

83. Defendants have acted under color and state of law to deprive Plaintiff of his federal civil and constitutional rights.

84. As a direct result of Defendants' retaliation and violation of Plaintiff's liberty and property interests, Plaintiff has suffered adverse employment sanctions.

85. As a direct result of Defendants' actions, Plaintiff has been publicly attacked, suffered damage to his standing in his home community, and suffered the foreclosure of other employment opportunities by the wrongful stigma imposed upon him.

86. As a further direct result of Defendants' actions, Plaintiff has suffered damage to his liberty and property rights, lost income, and lost future earnings, at an amount to be determined at trial.

87. Defendants retaliated against Plaintiff without giving him any due process.

88. Plaintiff requests an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988.

### Fourth Claim
### (Intentional/Reckless Infliction of Severe Emotional Distress)
### (Against All Defendants)

89. Plaintiff realleges the allegations of paragraphs 1-88 herein.

90. Defendants engaged in conduct that was intended to inflict severe emotional distress on Plaintiff, and/or was committed with knowledge that it was substantially certain their conduct would result in severe emotional distress to Plaintiff. Alternatively, Defendants acted in deliberate disregard that their misconduct would cause Plaintiff to suffer severe emotional distress.

91. Defendants' conduct was an extraordinary transgression of socially tolerable behavior, and was extreme and outrageous.

92. Defendants' conduct caused Plaintiff to suffer severe emotional distress. Plaintiff sought and received treatment for post-traumatic stress disorder as a result of Defendants' conduct and further treatment is necessary.

93. As a direct result of Defendants' acts, Plaintiff has suffered economic and non-economic damages in an amount to be determined at trial.

### Prayer for Relief

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A. Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

B. Enter judgment in Plaintiff's favor on all claims for relief;

C. Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that he has suffered and is reasonably certain to suffer in the future;

D. Award Plaintiff punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

E. Award pre-judgment and post-judgment interest at the highest lawful rate;

F. Award Plaintiff his reasonable attorneys' fees (including expert fees) and all other costs of this suit; and

G. Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

## Jury Demand

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

/s/ Danielle M. Chaffin
Danielle M. Chaffin (0093730)
Daniel J. Leffler (0076540)
OHIO PATROLMEN'S BENEVOLENT ASSOCIATION
10147 Royalton Road, Suite J
North Royalton, Ohio 44133
Phone: 440-237-7900
Fax: 440-237-6446
dchaffin@opba.com
dleffler@opba.com

Attorneys for Plaintiff.